NOT FOR PUBLICATION

RECEIVED

DEC - 4 2013

AT 8:30_____M
WILLIAM T. WALSH CLERK

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

BRYAN MAHER,

        *Plaintiff,*

    v.

ABBOTT LABORATORIES,

        *Defendant.*

Civil Action No. 11-5161 (PGS) (TJB)

**MEMORANDUM**

**SHERIDAN, U.S.D.J.**

This matter comes before the Court on Defendant Abbott Laboratories' ("Abbott" or "Defendant") Motion for Summary Judgment (ECF No. 32) pursuant to FED. R. CIV. P. 56. *Pro se* Plaintiff Bryan Maher ("Maher" or "Plaintiff"), a former employee of Abbott, alleges that Abbott subjected him to discrimination on the basis of his actual and/or perceived disability and association with his disabled son, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et. seq. and the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 et. seq.. Specifically, Plaintiff alleges that Abbott failed to accommodate him, failed to engage in the interactive process and retaliated against him for requesting a reasonable accommodation. Count I of Plaintiff's complaint asserts claims of disability discrimination, association discrimination and retaliation under the ADA. Count II asserts claims of disability discrimination, association

discrimination and retaliation under the NJLAD.[1] Defendant moves for summary judgment on all

claims, arguing that Plaintiff cannot establish a *prima facie* case for disability discrimination or

retaliation under either the ADA or the NJLAD. In the alternative, Defendant argues that even if

Plaintiff can establish a *prima facie* case of disability discrimination or retaliation, Plaintiff fails to

produce any evidence that raises a genuine issue as to whether Abbott's proffered legitimate, non-

discriminatory reason for his termination – poor performance - was pretext for discrimination. For

the reasons set forth herein, Defendant's Motion for Summary Judgment is granted in part and

denied in part.

## I. BACKGROUND

### A. Plaintiff's Employment with Abbott

In April or May 2008, Plaintiff Bryan Maher interviewed for a sales representative position

at Abbott Laboratories with Abbott Regional Sales Manager Gary Hamil. (Defendant's Statement of

Material Facts ("Def.'s Statement of Facts") ¶ 1; Deposition of Bryan Maher ("Pl. Dep.") 23:4-24:4).

During this interview, Plaintiff first informed Mr. Hamil that his son is autistic. (Def.'s Statement of

Facts ¶ 67; Pl. Dep. 42:23-43:3). On May 19, 2008, Abbott informed the Plaintiff via letter of the

company's decision to offer him the position of Senior Distribution Specialist for the Mid

Atlantic/Capital region. (Pl. Dep. Ex. 3). Mr. Maher accepted Abbott's offer on May 20, 2008. (*Id.*).

On June 2, 2008, Plaintiff officially began his employment as a Senior Distribution Specialist

where he was tasked with supporting Abbott's Point of Care Division, which manufactures and

distributes handheld diagnostic "i-STAT" devices that provide real-time, lab-quality results for

patient point-of-care testing. (Def.'s Statement of Facts ¶¶ 2-3). In that role, Plaintiff was responsible

for engaging with Abbott's Distribution Partners, including Fisher Scientific, Henry Schein, and

---

[1] Since the Plaintiff is a *pro se* party, the Court has an obligation to construe his submissions broadly. *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972); *see also United States v. Day*, 969 F.2d 39, 42 (3d Cir. 1992).

Cardinal Health, to generate both direct and indirect sales of Abbott's i-STAT products to hospitals and physicians within his assigned territory. (Def.'s Statement of Facts ¶ 4; Pl. Dep. 50:2-9, 51:3-13, Pl. Dep. Ex. 5). As a Senior Distribution Specialist, Plaintiff was also responsible for preparing quotes and distribution order forms for Abbott's i-STAT customers. (Def.'s Statement of Facts ¶ 6; Pl. Dep. 29:3-8).

From June 2, 2008 until January 2009, Plaintiff reported directly to Mr. Hamil, then-Regional Sales Manager for the Eastern Region of Abbott's Point of Care Division. (Affidavit of Gary Hamil ("Hamil Aff.") at ¶ 2). In January 2009, Plaintiff began reporting to Todd Horney who replaced Mr. Hamil as Regional Sales Manager for the Eastern Region. (Affidavit of John Todd Horney ("Horney Aff.") at ¶ 2). After Mr. Horney was later transferred to Abbott's Central Region in December 2009, Plaintiff again reported to Mr. Hamil who was reassigned to his former position in January 2010. (Pl. Dep. 25:22-27:7; Hamil Aff. at ¶ 2; Horney Aff. at ¶ 2). Plaintiff continued to report to Mr. Hamil until his termination from Abbott on May 11, 2010. (Pl. Dep. 17:3-9).

According to the Defendant, beginning in 2009, Mr. Hamil and Mr. Horney observed that Plaintiff's sales numbers and job performance were suffering from deficiencies. (Horney Aff. at ¶ 4; Hamil Aff. at ¶ 14). In June 2009, Mr. Horney began weekly one-on-one coaching and counseling telephone calls with Mr. Maher in an effort to address these issues and improve his sales numbers. (Horney Aff. at ¶ 4). Despite these efforts, the Defendant contends that Mr. Hamil and Mr. Horney continued to observe problems. For example, at an Abbott business review that took place on June 24 and June 30, 2009, Mr. Hamil and Mr. Horney observed that Plaintiff was unable to complete business review templates without assistance and did not understand how to make financial projections using sales data from his territory. (Def.'s Statement of Facts ¶ 34; Horney Aff. at ¶ 7; Hamil Aff. at ¶ 14). In addition, Plaintiff continued to rank last in Abbott's internal rankings of its

twelve Regional Distribution Specialists' sales performances. (Horney Aff. at ¶ 5, Ex. A; Def.'s Statement of Facts ¶¶ 33-34).

On August 28, 2009, after failing to observe sustained improvement in Mr. Maher's job performance, Mr. Horney placed Mr. Maher on an "informal coaching plan." (Pl. Dep. 61:17-62:7; Pl. Dep. Ex. 15; Horney Aff. at ¶ 4). In a memorandum which was signed and acknowledged by the Plaintiff on August 31, 2009, Mr. Horney explained that the "purpose of this document is to address performance gaps and clarify expectations. As discussed on June 8[th], your current level of performance is currently not meeting expectations and requires improvement." (Pl. Dep. Ex. 15). Mr. Horney went on to describe the coaching and counseling that had already taken place and identify additional areas of concern that had arisen since June 2009. He wrote:

> Performance discussions were held, in addition to several one-on-ones. During these discussions specific performance expectations were provided as well as feedback regarding areas in which improvement was necessary. Below is a summary of our discussions. After traveling together, and several phone calls offering advice on selling into our current market place your performance remained constant giving you a rating of 12 out of 12 representatives for the 4th Quarter in a row. Your performance has not improved to the level of expectation and you were put on formal "Weekly Reporting" on Jun 8[th] 2009. Your business review on both June 24th and June 30th continued to show a lack of understanding toward the market. Your presentation skills on June 30th showed poor preparation (no rehearsals), appeared unenthusiastic, and did not demonstrate an ability to explain what you had written. All of the above are in keeping with your grade level. (Id.).[2]

After identifying specific areas for improvement and outlining a detailed set of expectations, Mr. Horney concluded his memorandum by stating, "I am committed to assisting you in order for you to meet expectations. Ultimately, improving your performance is your responsibility and you remain accountable for results . . . Immediate, consistent and sustained performance is necessary or you may be subject to further disciplinary action, up to and including termination." (Id.). At oral

---

[2] In his opposition to Abbott's Motion for Summary Judgment, Plaintiff states that these one-on-one performance discussions "never happened." The occurrence of these discussions, however, was explicitly mentioned in the memorandum which Plaintiff signed and acknowledged on August 31, 2009.

argument, the Plaintiff stated that Mr. Horney later acknowledged that Mr. Hamil was the person responsible for placing Mr. Maher on the informal coaching plan. (Oral Arg. Tr. 15:22-16:5).

Despite the implementation of the informal coaching plan at the end of August 2009, Abbott continued to receive complaints from customers and Distribution Partners about Mr. Maher's job performance. (Def.'s Statement of Facts ¶ 36). For example, on September 29, 2009, Mr. Horney had to approve a $40,000 credit to a customer due to the fact that Mr. Maher had placed the entire order at the same time instead of arranging to have it shipped in two installments as the customer had requested. (Horney Aff. at ¶ 8, Ex. B-C).

In October 2009, two months after having been placed on the informal coaching plan due to his job performance, Plaintiff was diagnosed with atrial fibrillation.[3] (Plaintiff's Complaint and Jury Demand (Compl.), at ¶ 13; Pl. Dep. 85:4-11). At oral argument, the Plaintiff indicated that stress "exacerbate[s]" his atrial fibrillation and causes his heart rate to increase to "160, 170 beats per minute[.]" (Oral Arg. Tr. 11:14-18). According to the Plaintiff, he did not need any special accommodations at work due to his condition (other than no heavy lifting); however, his atrial fibrillation sometimes caused confusion and lethargy. (Pl. Dep. 37:15-18, 41:10-16). In an e-mail dated October 6, 2009, Plaintiff informed Mr. Horney that he was going to have a heart ablation procedure to treat his condition. (Pl. Dep. Ex. 9).[4] Plaintiff stated in the e-mail:

> Also, with your permission first, I received a call from my heart doctor in Florida and he has a cancellation to do [h]eart ablation on October 28th at JFK Hospital in Lake Worth Florida. I was looking to take off Tuesday Oct 27 Oct 28 Oct29 Oct

---

[3] In his complaint, Plaintiff states that he was diagnosed with atrial fibrillation "[o]n or about October 27, 2009[.]" (Compl. ¶ 13). During his deposition, however, Plaintiff contradicted that statement by stating his diagnosis was first made in 2006. (Pl. Dep. 36:5-10).

[4] The Defendant's Statement of Material Facts incorrectly states that Plaintiff first informed supervisor Horney of his diagnosed medical condition on October 9, 2009. (Def.'s Statement of Facts ¶ 63). Plaintiff's complaint, in contrast, alleges that he informed both Horney and Hamil of his diagnosis "[o]n or about October 27, 2009[.]" (Compl. at ¶ 14). An e-mail sent from Plaintiff to supervisor Horney which is included as an exhibit to Mr. Maher's deposition indicates that this conversation actually occurred on October 6, 2009. (Pl. Dep. Ex. 9). At oral argument, Plaintiff suggested that he first informed Mr. Hamil that he was "on medication for [his] heart . . . when [he] first started" his job in June 2008. (Oral Arg. Tr. 13:8-14:6).

30[.] Back home Oct31st. Just to give you background info[,] [m]y heart goes in and out of rhythm most every day . . . The medication I am on slows down the rate but sometimes makes you very tired. *Id.*

In response, Mr. Horney sent an e-mail to Plaintiff stating: "Please take the time you need. Your health is extremely important, so move forward to get it right and get better. Contact MyHR for assistance in requesting Sick Leave, or extended absence." *Id.* After having the heart ablation procedure on October 27, 2009, Plaintiff took off two weeks from work.[5] (Pl. Dep. 38:21-39:1). Rather than contacting Abbott's "myHRTeam" to arrange for extended sick leave or a short-term medical leave of absence, Plaintiff opted to use his vacation days to cover the two week period. (Def.'s Statement of Facts ¶ 65; Pl. Dep. 38:21-39:12).

On December 4, 2009, Plaintiff received an overall rating of "Partially Achieved" in his 2009 annual performance review prepared by Mr. Horney. (Def.'s Statement of Facts ¶ 37; Pl. Dep. Ex. 17). The "Partially Achieved" rating is the second lowest of four possible rating categories which include: Exceeds Expectations ("EE"), Achieved Expectations ("AE"), Partially Achieved Expectations ("PA") and Not Achieved Expectations ("NA"). (Def.'s Statement of Facts ¶ 38). The overall performance rating is derived from an average of the performance ratings the employee receives in six "core job responsibilities." (Pl. Dep. Ex. 17).

Plaintiff received a "Partially Achieved" rating in his core job responsibility of "[m]eet[ing] or exceed[ing] annual sales budgets." (*Id.*) He was rated as "Achieved Expectations" in his core job responsibility of "[e]stablish[ing] and maintain[ing] a territory travel schedule that maximize[d] [his] sales efforts to ensure goal attainment." (*Id.*) In describing Plaintiff's rating for this category, Mr. Horney wrote that "Bryan increased his focus in PA and [the] hospital markets[]" which "proved to be a successful tactic[,]" and "through his distribution partners he was able to broaden his sales even

---

[5] Plaintiff had two additional heart ablation procedures performed after his termination from Abbott. Those procedures occurred on July 8, 2010 and December 9, 2011. (Pl. Dep. 38:8-17).

in a difficult environment[.]" (*Id.*) Mr. Maher also received an "Achieved Expectations" rating for "[e]stablishing and maintain[ing] an active roster for all [distributor] partner managers and representatives in [his] territory." (*Id.*) In explaining this rating, Mr. Horney wrote that "[Bryan] did maintain an active roster, contact, and the pursuit of collective goals with the distribution teams and management." (*Id.*) In addition, Plaintiff was rated as "Achieved Expectations" for "[p]rovid[ing] ongoing feedback to management relative to process improvements, [i-STAT] competition, marketing programs, new product ideas and general territory activities" and "conduct[ing] [himself] within the company's guidelines relative to business ethics and integrity expectations." (*Id.*) According to Mr. Horney, "[Bryan's] integrity was never a question with regard to Abbott Point of Care guidelines." (*Id.*) Mr. Horney "did however receive very little if any [feedback] relative to the entire team on trends, products or territory activities." (*Id.*)

Plaintiff did not achieve expectations in several of his core job responsibilities. Specifically, Mr. Maher was rated as "Not Achieved" in two evaluation categories, including maintaining all administrative responsibilities for his territory and ensuring all customer, distributor and management requests are met on time. (*Id.*). In describing the former, Mr. Horney wrote that Mr. Maher "did submit all reports, but several were late and lacking information . . . He seems to have difficulty with even simple and repetitive tasks such as Distribution Order Forms." (*Id.*) In justifying the latter, Mr. Horney wrote that he "received approximately 6 complaints relative to [Bryan's] product knowledge. They came [from] distribution partners, Abbott PGD, Abbott ADD, and even customers. Although I do believe that [Bryan] did attempt to train and provide knowledge, [his] foundation fell extremely short." (*Id.*) Mr. Horney summarized Plaintiff's 2009 overall performance as follows:

> [Bryan] struggled this year and was put on a Coaching Plan. He did meet the sales goals of this plan, but never turned around his administrative goals and this

affected the way distribution partners and customers reacted to him from a confidence standpoint. This being said, he will face similar challenges in 2010 if he does not adjust his timelines and clarity in administration, and increase his implicit means of communication toward distribution partners and customers. (*Id.*).

According to the Defendant, in late 2009 and early 2010, Abbott continued to receive complaints from its customers and Distribution Partners regarding Plaintiff's job performance. For example, on December 16, 2009, approximately two weeks after Plaintiff's performance review, Mr. Hamil received an e-mail from an Abbott financial analyst informing him that Plaintiff had caused processing issues for Abbott customer Bravo Health by submitting several different versions of a distribution order form. (Hamil Aff. at ¶ 5). The financial analyst indicated that Mr. Maher had "submitted several distributor order forms . . . with things changing each time he submit[ted] the form." (Hamil Aff. Ex. A). He further stated that the situation had "reached the point where the distributor rep[resentative] [was] e-mailing customer service." (*Id.*). Plaintiff states that Bravo Health's processing issues were not caused by an error on his part, but rather, resulted from Abbott's failure to maintain a sufficient number of user manuals for its i-STAT products. (Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n") at 27).

On January 4, 2010, Mr. Hamil told Mr. Maher that Abbott customer Bucks County Specialty Hospital needed to return product it had ordered in error. (Hamil Aff. at ¶ 9, Ex. E; Pl. Dep. Ex. 16). Almost one month later, on February 3, 2010, Mr. Hamil received an email from the customer stating that they had not heard from Mr. Maher in weeks and the items still needed to be returned. (*Id.*). According to the Plaintiff, he tried calling the customer to tell them to ship the product back, however, he received no response. (Pl.'s Opp'n at 13, 84-85).

On January 6, 2010, Mr. Hamil received an e-mail from Abbott customer Good Shepherd Penn Partners voicing a complaint regarding Mr. Maher's lack of follow-up and accessibility.

8

(Hamil Aff. at ¶ 6, Ex. B). In that e-mail, a representative from Good Shepherd stated that she "ha[d] not heard from Brian . . . and [she was] not used to unreturned phone calls." (*Id.*). According to the representative, Mr. Maher's lack of responsiveness was "a serious concern for [her] and [her] institution." (*Id.*) One day later, on January 7, 2010, Abbott had to approve replacement of product with a Cardinal Health hospital account because Mr. Maher provided them with an incorrect quote. (Pl. Dep. Ex. 16).

On January 26, 2010, Mr. Hamil received several communications concerning Mr. Maher's apparent lack of responsiveness to addressing the needs of Abbott customer Penn Medical Rittenhouse ("Rittenhouse"). (Hamil Aff. at ¶ 7, Ex. C-D). In one e-mail, an Abbott Point of Care Specialist indicated that he had been contacted by Rittenhouse regarding the lack of service being provided by Mr. Maher. (*Id.*). Later that day, Rittenhouse sent an e-mail directly to Mr. Hamil requesting that they be assigned to a different sales representative due to Mr. Maher's failure to service their account. (*Id.*). Rittenhouse justified its request by stating that "[t]o this day we have not had any service or assistance from Bryan."[6](Hamil Aff. Ex. D). In January 2010, Abbott customer Evangelical Sylvan Hospital also informed Mr. Hamil that they no longer wanted to work with Mr. Maher and asked for a replacement Distribution Specialist to service their account. (Hamil Aff. at ¶ 8). The Defendant contends that in light of these customer complaints and in reaction to observed deficiencies in Plaintiff's job performance, Mr. Hamil approached Abbott's Employee Relations on January 28, 2010 regarding implementing formal performance management for Mr. Maher. (Hamil Aff. at ¶ 15). Abbott's Employee Relations agreed with Mr. Hamil's request and worked with him to develop Plaintiff's Performance Improvement Plan ("PIP"). (*Id.*)

---

[6] At his deposition, Plaintiff averred that the Rittenhouse account had been transferred from him to another Abbott sales representative without informing Rittenhouse of the change. (Pl. Dep. 69:21-70:12). In his Opposition to Defendant's Motion for Summary Judgment, Plaintiff repeatedly states that the Penn Medical Rittenhouse account was "not [his] account." (Pl.'s Opp'n at 10, 13, 28, 66, 78).

On or about February 10, 2010, one week prior to his PIP being finalized, Plaintiff requested a "brief medical leave of absence" from Mr. Hamil due to the fact that he was "feeling ill due to stress." (Compl. ¶ 15). At the time Plaintiff issued this request, he reiterated to Mr. Hamil that his son suffered from autism. (*Id.* at ¶ 16). In response, Mr. Hamil allegedly responded, "I don't give a shit about your stress, your heart, and I hate to say it but your son either. We need sales and we need numbers." (*Id.* at ¶ 17). He allegedly further stated his belief that Mr. Maher would be distracted by his son's disability and unable to perform his expected job duties (*Id.* at ¶ 18). In response, Plaintiff assured Mr. Hamil that he was able to perform the essential functions of the job despite his disability and his commitment to care for his disabled son. (Compl. ¶ 19). The Plaintiff did not take time off from work immediately following his February 10, 2010 request.

On February 17, 2010, Plaintiff was officially placed on a PIP which identified his areas of performance deficiency and steps for correcting them. (Hamil Aff. at ¶ 16-17; Pl. Dep. Ex. 16). Abbott stated its justification for the PIP to Mr. Maher as follows:

> During the course of 2009 and early 2010 areas for performance improvement were identified, strategies were set forth to help you improve performance and numerous discussions were held to provide specific feedback to assist you. Because you have not demonstrated immediate and sustained performance improvement you are being placed on a Performance Improvement Plan for up to 90 days effective immediately. (*Id.*).

The PIP informed Mr. Maher that failure to meet the expectations of the plan would result in a review for termination of his employment with Abbott. It further warned, "If your performance does not show immediate, consistent and sustained performance improvement or if there is another incident of a customer complaint/request for a new representative we reserve the right to terminate your employment before the 90-day period ends." (*Id.*) The PIP also acknowledged that Mr. Maher's sales numbers improved slightly toward the end of 2009, primarily due to a large government order of the i-STAT product. (*Id.*; Horney Aff. at ¶ 6). According to Mr. Maher, he was designated as the

"Representative of the Quarter" for the third sales quarter of 2009 as a result of these sales. (Compl. ¶ 22).

According to the Defendant, Abbott continued to receive complaints from its customers and Distribution Partners while Mr. Maher was on the PIP. On February 23, 2010, Mr. Hamil received a complaint from Distribution Partner Fisher Healthcare regarding the length of time it took Plaintiff to provide a price quote to a customer. (Hamil Aff. at ¶ 10). On March 10, 2010, Mr. Hamil was notified that Abbott customer All Better Care was dissatisfied because they did not know how to properly operate the i-STAT device because Mr. Maher had sent them an incorrect manual and had not yet conducted a training session. (Hamil Aff. at ¶ 11, Ex. F). According to the Plaintiff, Abbott's customer service department was responsible for shipping the incorrect manual. (Pl.'s Opp'n at 67; Oral Arg. Tr. 20:4-12).

Nine days later, on March 19, 2010, Plaintiff sent an urgent e-mail to Mr. Hamil stating that "[s]omething very urgent and personal has come up, I need to address immediately, I will be [taking] a personal day today." (Pl. Dep. Ex. 18). Two days after that, Mr. Maher sent another e-mail to Mr. Hamil requesting an additional two weeks off to care for his autistic son. He wrote:

> Due to the urgency and personal importance of my current situation with my family, I have no other choice but to take the next 2 weeks off through vacation time to address this very, very important family matter. Gary, I appreciate all your excellent guidance in the Abbott arena and more importantly, your understanding about my family, that no other person could comprehend or understand[.] I am at a breaking [point] in my life right now and I just want to make sure I survive the weeks ahead. (*Id.*)

After sending his request on March 21, 2010, Plaintiff took off the following two weeks. Rather than contacting Abbott's Integrated HR Service Center to arrange for a family leave of absence, Plaintiff again opted to use his vacation days to cover the two week period. (Pl Dep. 34:20-35:13, 71:4-13, 72:18-73:4, 75:0-78:13). On March 23, 2010, while Plaintiff was taking vacation

time to care for his son, Mr. Hamil e-mailed Mr. Maher saying, "While you are out we need to make sure that your area continues to perform. Please make sure you forward any customer or distributor issues to my attention. Also make sure your computer automatic notice is activated, you can have everyone contact me while you are out." (*Id.*) At his deposition, Mr. Maher described his reasons for requesting the additional two weeks of vacation as follows: "I needed the accommodation in February and he wouldn't give it to me[,] I finally got to the point where I said, you know what, I'm going to send him an e-mail and I'm going to take it myself." (Pl. Dep. 78:18-25).

On March 25, 2010, the customer complaints continued when Mr. Hamil received an e-mail from Abbott customer Memorial Hospital stating that they had contacted Mr. Maher in January, February and March of 2010 regarding an issue to which, as of March 25, 2010, he still had not responded. (Hamil Aff. at ¶ 12). On April 6, 2010, Mr. Hamil learned of an incorrect pricing issue with Abbott customer Union Hospital, an account serviced by Mr. Maher. (Horney Aff. at ¶ 9, Ex. D). Plaintiff states that the incorrect pricing issue occurred because Abbott's "computer people dropped the ball." (Pl.'s Opp'n at ¶ 54). He further states that the pricing issue arose because the customer ordered the incorrect product. (Oral Arg. Tr. 25:9-18). On April 16, 2010, Mr. Hamil was told that Abbott customer Levindale Hebrew Geriatric Hospital complained that Mr. Maher was not servicing their needs and requested a different sales representative be assigned to their account. (Hamil Aff. at ¶ 13, Ex. H). According to the e-mail, the "[p]rimary issue [was] the customer ha[d] commented on not getting serviced by the other rep[resentative] that covers this account (Bryan Maher)." (*Id.*).

As a result of these continued customer and Distribution Partner complaints, Mr. Hamil believed that Plaintiff failed to meet the expectations of the PIP. (Hamil Aff. at ¶¶ 17-19). In accordance with the terms of the PIP, Abbott's Employee Relations made the recommendation to

terminate Plaintiff's employment with Abbott due to "poor performance." (Hamil Aff. at ¶ 19). The termination recommendation was supported by Mr. Hamil and Abbott National Sales Director Richard Rudolph. (*Id.*) On May 11, 2010, Plaintiff received a phone call from Mr. Hamil informing him that he was terminated effective immediately. (Oral Arg. Tr. 28:20-25). According to the Plaintiff, he did not receive an exit interview or an explanation for his termination. (*Id.* at 29:2-18). On June 24, 2011, a Notice of Right to sue letter was issued by the United States Equal Employment Opportunity Commission ("EEOC"). On September 8, 2011, Plaintiff timely filed his complaint in this matter.

## II.    DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey*

*Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995). To do so, the non-moving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. In other words, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fidelity Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990); *see also* Fed. R. Civ. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."). Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *Anderson*, 477 U.S. at 247-48. If a court determines, "after drawing all inferences in favor of [the non-moving party], and making all credibility determinations in his favor – that no reasonable jury could find for him, summary judgment is appropriate." *Alveras v. Tacopina*, 226 Fed. Appx. 222, 227 (3d Cir. 2007). "[P]ro se plaintiffs are not relieved of the obligation to set forth facts sufficient to survive summary judgment." *Jacobs v. Cumberland County Dept. of Corrections*, No. 09-0133, 2010 U.S. Dist. LEXIS 130007, 2010 WL 5141717, at *3 (D.N.J. Dec. 8, 2010).

## B. ADA and NJLAD Discrimination

The ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and

privileges of employment." 42 U.S.C. § 12112(a). The term "qualified individual" is defined for purposes of the ADA as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The NJLAD similarly prohibits "any unlawful discrimination against any person because such person is or has been at any time disabled or any unlawful employment practice against such person, unless the nature and extent of the disability reasonably precludes the performance of the particular employment." N.J.S.A. 10:5-4.1.

Plaintiff contends that Defendant subjected him to unlawful discrimination by failing to accommodate his disability, failing to engage in the interactive process, and instituting adverse employment action against him based on his disability and his association with his autistic son. Specifically, Plaintiff's allegations of disability discrimination are based on: (1) a purported denial of his request to take one week off from work in June 2009 to deal with stress and his heart (Pl. Dep. 87:19-88:9); (2) a denial of his request at the end of 2009 to have New Jersey removed from his sales territory (*Id.* at 88:17-89:11); (3) a purported denial of his request to take two weeks off from work in February 2010 (*Id.* at 72:18-73:23); (4) an alleged statement made by Mr. Hamil in February 2010 in which he stated, "I don't give a shit about your stress, your heart, and I hate to say it but your son either. We need sales and we need numbers" (*Id.*; Compl. ¶ 17); (5) his placement on an informal coaching plan on August 28, 2009 (Pl. Dep. 91:22-24); and (6) his placement on a PIP on February 17, 2010. (Compl. ¶ 21).

Defendant asserts that Plaintiff fails to establish a *prima facie* case of disability discrimination under either the failure to accommodate or failure to engage in the interactive process theories. Defendant further asserts that even if Plaintiff has established a *prima facie* case of disability discrimination under either theory, his claim cannot withstand summary judgment because

15

he failed to proffer sufficient evidence upon which a reasonable jury could find that Abbott's stated reason for Plaintiff's termination – poor performance – was in fact pretext for discrimination.

In the absence of direct evidence, a plaintiff may prove discrimination under the ADA and NJLAD through the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[7] Under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a *prima facie* case of unlawful discrimination. *McDonnell Douglas*, 411 U.S. at 802. In order to establish a *prima facie* case of disability discrimination under the ADA and the NJLAD, a plaintiff must show that "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998); *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2004); *Victor v. State*, 401 N.J. Super. 596, 952 A.2d 493, 504 (N.J. Super. Ct. App. Div. 2008).[8] More specifically, to establish a *prima facie* case of discrimination under either a failure to accommodate or failure to engage in the interactive process theory, a plaintiff must demonstrate that: (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but

---

[7] "The standard for analyzing an NJLAD claim in the summary judgment context is the same as that applicable to claims of discrimination under federal statutes." *Berry v. Lombardi*, 2005 U.S. Dist. LEXIS 24535, at *24 (D.N.J. Oct. 13, 2005) (citing *Lawrence v. Nat'l Westminster Bank N.J.*, 98 F.3d 61, 70 (3d Cir. 1996)).

[8] For purposes of this Motion for Summary Judgment, Defendant does not dispute that Plaintiff was disabled within the meaning of the ADA and the NJLAD. (Def.'s Resp. Br. at 6; Tr. of Oct. 21, 2013 Oral Arg. ("Oral Arg. Tr.") 1:24-26). At oral argument, Defendant further stated that it does not contend that Plaintiff's stress is a separate disability from his heart condition. (Oral Arg. Tr. 2:8-21). The Court's discussion is, therefore, limited to whether Plaintiff is able to satisfy the other elements of his *prima facie* case and, if so, whether he has presented sufficient evidence to show that Abbott's articulated reason for his termination was both pretextual and motivated by discriminatory intent.

for the employer's lack of good faith." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 319-20 (3d. Cir. 1999).

Once the plaintiff establishes a *prima facie* case for discrimination, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for its decision. *McDonnell Douglas*, 411 U.S. at 802. The burden then shifts back to the plaintiff to establish by a preponderance of the evidence that the employer's articulated reason was in fact pretext for discrimination. *Id.*; *see also Terry v. Town of Morristown*, 446 Fed. Appx. 457, 461 (3d Cir. 2011). To prove pretext and defeat summary judgment, the plaintiff must "submit evidence which: (1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or (2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Id.* (citing *Fuentes v. Perskie*, 32 F.3d 759, 762 (3d Cir. 1994)). A plaintiff "may not simply show that the employer's reason was false but must also demonstrate that the employer was motivated by discriminatory intent." *Zive v. Stanley Roberts, Inc.*, 867 A.2d 1133, 1138 (N.J. 2005). In this instance, Plaintiff has not presented, nor does he allege, that there is any direct evidence of disability discrimination. Accordingly, his claims are analyzed pursuant to the *McDonnell Douglas* framework.

### 1. Failure to Accommodate under the ADA and NJLAD

The ADA specifically provides that an employer "discriminates" against a qualified individual with a disability when the employer does "not mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." 42 U.S.C. § 12112(b)(5)(A); *Taylor*, 184 F.3d at 306.

In order to prevail on a failure to accommodate claim under the ADA or the NJLAD, a plaintiff must demonstrate that: (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his disability; (3) the employer did not make a good faith effort to assist; and (4) the employee could have been reasonably accommodated. *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240, 246 (3d Cir. 2006); *Tynan v. Vicinage 13 of Superior Court*, 351 N.J. Super. 385, 396, 798 A.2d 648 (App. Div. 2002); *Taylor*, 184 F.3d at 317-20. Defendant asserts that Plaintiff cannot establish a *prima facie* case of discrimination for any of the identified instances in which the Defendant allegedly failed to accommodate Plaintiff's disability. The Court will address each of these instances in turn.

### a. Plaintiff's June 2009 Request for Vacation

Plaintiff first claims that Abbott failed to accommodate his disability by denying his request in June 2009 for permission to take one week off from work due to stress and his heart. (Pl. Dep. 87:19-88:9). With respect to this claim, Plaintiff cannot meet the first element of his *prima facie* case because he admits that he was not diagnosed with atrial fibrillation and did not inform Mr. Hamil and Mr. Horney of his diagnosis until October 2009 – four months after his June 2009 request. (Compl ¶ 13-14). In clarifying what notice must be given by an employee to his employer to put the employer on notice of a request for accommodation, the Third Circuit has stated that "while the notice does not have to be in writing, be made by the employee, or formally invoke the magic words 'reasonable accommodation,' the notice nonetheless must make clear that the employee wants assistance for his or her disability." *Taylor*, 184 F.3d at 313. According to the Third Circuit, "the employer must know of both the disability and the employee's desire for accommodations for that disability." *Id*. Here, the record indicates only that Plaintiff asked Mr. Hamil for a week off in June 2009 due to "stress" and "[his] heart." (Pl. Dep. 87:19-88:9). Nothing in Plaintiff's statement

suggested the nature or extent of his illness and Plaintiff offers no additional evidence to indicate that the request placed his supervisors on notice of either the fact that he had a disability or a desire to be accommodated for a disability. In fact, Plaintiff himself was not even aware that he had a disability at the time the request was made because, as stated in his complaint, his atrial fibrillation was not diagnosed until October 2009. As stated by the Third Circuit, "[e]mployers cannot assume employees are disabled and need accommodations." *Taylor*, 184 F.3d at 314. Accordingly, to the extent that Plaintiff bases his failure to accommodate claim on Abbott's denial of his request to take time off in June 2009, his claim fails as a matter of law. The entry of summary judgment on this claim is, therefore, appropriate.

### b. Plaintiff's Late 2009 Request to Remove New Jersey From His Sales Territory

Plaintiff also claims that Abbott failed to accommodate his disability when it denied his request at the end of 2009 to remove New Jersey from his sales territory and assign it to a different Distribution Specialist. (Pl. Dep. 88:17-89:11). According to his deposition testimony, Plaintiff first informed Mr. Hamil "toward the end of 2009" that "the New Jersey area was too far for [him]" because he "lived in Pennsylvania."[9] (*Id.* at 89:4-11). He further explained at his deposition that "[i]t would be better to bring another rep[resentative] [into] cover" the state. (*Id.*). Plaintiff, however, fails to present any additional evidence indicating that his request to remove New Jersey from his sales territory either constituted a request for accommodation or was reasonable within the meaning of the ADA and the NJLAD. Even if Plaintiff had presented such evidence, his claim would fail as a matter of law because the transfer of work-related responsibilities from a disabled employee to another employee does not constitute a reasonable accommodation as discussed below.

---

[9] It is unclear from the record as to whether Plaintiff's request to have New Jersey removed from his sales territory was intended to accommodate his disability or simply minimize the amount of travel required for his job. Plaintiff fails to distinguish between these explanations and offers no evidence to indicate that his medical condition was either related to or exacerbated by his job's requirement that he travel to New Jersey.

The ADA excuses an employer from accommodating an individual with a disability if the accommodation would impose an undue hardship on that employer. *See* 42 U.S.C. § 12112(b)(5)(A) (stating that an employer does not violate the ADA for failing to provide a reasonable accommodation if the employer can "demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."). In addition, the ADA "does not relieve a disabled employee . . . from the obligation to perform the essential functions of a job. To the contrary, the ADA is intended to enable disabled persons to compete in the workplace based on the same performance standards and requirements that employers expect of persons who are not disabled." 29 C.F.R. pt. 1630, app. § 1630. The EEOC regulations recognize that lowering or changing an employee's performance standards because of that employee's disability is not considered a reasonable accommodation. *See* 29 C.F.R. pt. 1630 app. § 1630.2(n).

Here, Plaintiff was hired to be the Senior Distribution Specialist for the Eastern Region of Abbott's Point of Care Division. In that role he was responsible for generating sales of Abbott's i-STAT products throughout the state of New Jersey. If Abbott had granted Mr. Maher's request, the company would necessarily have been required to assign sales responsibilities in New Jersey to another Distribution Specialist. This Court has found, however, that requiring an employer to reassign another employee to perform the functions of a disabled employee does not constitute a reasonable accommodation. *See Kivman v. UPS*, 2010 U.S. Dist. LEXIS 75850, at * 18 (D.N.J 2010). In *Kivman*, the plaintiff requested that a coworker be assigned to monitor his performance and provide written specifications for his assignments. The Court stated in no uncertain terms that "it would not be a reasonable accommodation under the [NJLAD] to require [the employer] to assign other employees to perform tasks, in addition to their own responsibilities." *Id.* Plaintiff's requested reassignment of New Jersey to another Distribution Specialist would do just that. Because such an

20

accommodation is not reasonable within the meaning of the ADA or NJLAD, Plaintiff cannot meet

the fourth element of his *prima facie* case. *See Baker v. Hunter Douglas, Inc.*, 270 Fed. Appx. 159,

163 (3d Cir. 2008) (affirming District Court's grant of summary judgment in part on grounds that

plaintiff's request that defendant "allow her to share her duties with another employee is not a

reasonable accommodation under NJLAD."). Accordingly, to the extent that Plaintiff bases his

failure to accommodate claim on Abbott's failure to remove New Jersey from his sales territory and

assign it to a different Distribution Specialist, his claim fails as a matter of law. The entry of

summary judgment on this claim is, therefore, appropriate.

### c. Plaintiff's February 2010 Request for Two Weeks' Vacation

Plaintiff also claims that Abbott failed to accommodate his disability when it denied his

February 2010 request to take two weeks of vacation to care for his autistic son and deal with his

heart condition. (Pl.'s Dep. 72:18-73:23). Because it is unclear as to whether Plaintiff's February

2010 request for accommodation was motivated primarily by his need to care for his son or his need

to manage his own disability, the Court will address each scenario separately.

### 1. Request as an Accommodation to Care For Son

The association provision of the ADA protects employees from discrimination based on their

relationship or association with an individual with a disability. It states, in relevant part, that "the

term 'discriminate against a qualified individual on the basis of disability' includes . . . excluding or

otherwise denying equal jobs or benefits to a qualified individual because of the known disability of

an individual with whom the qualified individual is known to have a relationship or association[.]"

42 U.S.C. § 12112(b)(4). This means than an employer is prohibited from making adverse

employment decisions based on unfounded concerns about the known disability of a family member

or anyone else with whom the employee has a relationship or association.

21

In describing an employer's obligations under the association provision of the ADA, the Third Circuit has stated that "the association provision does not obligate employers to accommodate the schedule of an employee with a disabled relative. Although [an employer's] refusal to 'make reasonable accommodations' may constitute illegal discrimination against a disabled employee, the plain language of the ADA indicates that the accommodation requirement does not extend to *relatives* of the disabled." *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 510 (3d Cir. 2009). The EEOC's interpretive guidelines confirm that the ADA does not require an employer to reasonably accommodate an employee so that the employee can care for a disabled family member. It states, in relevant part, "It should be noted [] that an employer need not provide the applicant or employee . . . with a reasonable accommodation because that duty only applies to qualified applicants or employees with disabilities." 29 C.F.R. pt. 1630.8, App. § 1630.8; *see also Tyndall v. Nat'l Educ. Ctrs., Inc. of Ca.*, 31 F.3d 209, 214 (4th Cir. 1994) (stating that "[t]he ADA does not require an employer to restructure an employee's work schedule to enable the employee to care for a relative with a disability.").

This Court has similarly concluded that the association provision of the ADA "does not mandate that an employer provide an employee . . . with a reasonable accommodation to enable the employee to care for a disabled individual with whom the employee is associated." *Kennedy v. Chubb Grp. of Ins. Cos.*, 60 F. Supp. 2d 384, 396 (D.N.J. 1999). In *Kennedy*, the plaintiff had worked for her former employer for approximately thirteen years, the last seven of which she was permitted to work on "short-week status" allowing her to care for her autistic son. After a performance evaluation, the employer informed the plaintiff that she would no longer be able to work on "short-week" status and that she would need to return to her original schedule. *Id.* at 389. After resigning due to the fact that such conditions prohibited her from taking care of her son,

plaintiff brought suit alleging violations of the ADA and NJLAD. The court first addressed plaintiff's state law claim and concluded that because there was no similar association language in the NJLAD, the claim failed as a matter of law. *Id.* at 395 ("The Court declines plaintiff's invitation to create a new cause of action under state law where there is no indication that the New Jersey Supreme Court would endorse such a position."). The court then found that the purpose of the ADA association provision was "to prohibit employers and potential employers from taking adverse employment action because of a known disability of an individual with whom the qualified employee or applicant is known to have a relationship or association." *Id.* at 396. The court concluded that "the ADA does not require [the defendant] to allow [the] plaintiff to continue to work part time because her request in that regard is necessitated by her need to care for her disabled son, [and that the] plaintiff has no claim under the association provision of the ADA." *Id.* Accordingly, the court granted the employer's motion for summary judgment on the ADA and NJLAD association discrimination claims. *Id.*

Here, the Plaintiff's request, like that of the plaintiff in *Kennedy*, was "necessitated by [his] need to care for [his] disabled son." *Kennedy*, 60 F. Supp. 2d at 396. Accordingly, to the extent that Plaintiff's failure to accommodate claim is based on Abbott's refusal to allow him to take two weeks of vacation in February 2010 to care for his son, his ADA claim fails as a matter of law. The Court finds the entry of summary judgment on Plaintiff's ADA association discrimination claim to be appropriate. In addition, because there is no indication that a failure to accommodate claim based on an employee's association with a disabled individual is cognizable under the NJLAD, the Court will similarly "decline plaintiff's invitation to create a new cause of action under state law" and grant summary judgment on Plaintiff's NJLAD association discrimination claim. *Id.* at 395.

### 2. Request as an Accommodation to Deal With Heart Condition

After reviewing all of the evidence in the light most favorable to the Plaintiff, the Court finds that, to the extent his February 2010 request sought an accommodation for his disability, Plaintiff has established a *prima facie* case of disability discrimination. Here, the record indicates that Mr. Hamil and Mr. Horney both knew about Plaintiff's disability at the time the request for accommodation was made. The record further indicates that Plaintiff requested two weeks off for the purpose of dealing with stress and his heart condition. In response to Plaintiff's request for accommodation, Mr. Hamil allegedly stated "I don't give a shit about your stress, your heart, and I hate to say it but your son either. We need sales and we need numbers" (Compl. ¶ 17). The Court finds that a reasonable jury could conclude, based on this statement, that Abbott did not make a good faith effort to assist Mr. Maher in dealing with his disability. Furthermore, a reasonable jury could conclude that Plaintiff could have been reasonably accommodated at the time of his request based on the fact that Plaintiff took the requested time off just one month later.

Because the Plaintiff has established a *prima facie* case of disability discrimination based on Defendant's failure to accommodate his February 2010 request, the burden shifts to the Defendant to "articulate some legitimate, nondiscriminatory reason" for its employment decision. *McDonnell Douglas*, 411 U.S. at 802. Here, the Defendant presents legitimate evidence showing that Plaintiff was placed on the informal coaching plan, the performance improvement plan, and terminated from his position as a result of his alleged failure to adequately perform his job duties. The record indicates that, in 2009 alone, Abbott received at least six separate complaints from the Distribution Partners and customers to whom Plaintiff was assigned. (Def.'s Statement of Facts ¶¶ 36, 40). In addition, as detailed above, the customer and Distribution Partner complaints continued into 2010 even after Plaintiff received informal coaching from his supervisors and was placed on the formal PIP. The Third Circuit has held that a long history of poor performance is a legitimate, non-

discriminatory reason for terminating an employee. *See D'Alessandro v. City of Newark*, 454 Fed.

Appx. 53, 56 (3d Cir. 2011); *see also Casseus v. Elizabeth Gen. Med. Ctr.*, 671 A.2d 176, 181 (N.J.

App. 1996) (stating that "an employee's poor performance in discharging his duties is a legitimate[,]

nondiscriminatory reason to fire or demote the employee."). As such, Defendant has satisfied its

burden at the second stage of the *McDonnell Douglas* analysis.

To meet his burden at the third stage of the analysis, Plaintiff must show that Defendant's

proffered legitimate, non-discriminatory reason – poor performance – is pretext for discrimination.

Thus, Plaintiff has to present evidence that would allow a factfinder to reasonably conclude that the

reason offered by Abbott was fabricated, or to otherwise find that Abbott had fired him for

discriminatory reasons. *See Fuentes*, 32 F.2d at 762. As stated by the Third Circuit, "[t]o cast doubt

on a company's proffered reasons for an adverse employment action, it is not enough to show that

the company's decision was 'wrong or mistaken, since the factual dispute at issue is whether

discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent,

or competent.'" *Emmett v. Kwik Lok Corp.*, 2013 U.S. App. LEXIS 12009, at * 9-10 (3d Cir. 2013)

(citing *Fuentes*, 32 F.2d at 765). Instead, Plaintiff is required to "demonstrate such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in [Abbott's] proffered legitimate

reason[] for its action that a reasonable factfinder *could* rationally find [it] unworthy of credence . . .

and hence infer that [Abbott] did not act for the asserted non-discriminatory reason[]." *Fuentes*, 32

F.2d at 765 (internal citations omitted).

Here, the Court finds that Plaintiff presents sufficient evidence from which a reasonable jury

could rationally find that Abbott's articulated reason for its employment action was false, or that the

decision to terminate him was the result of discriminatory motive for several reasons. First, a

reasonable jury could rationally find that Mr. Hamil's February 2010 statement is evidence that

Plaintiff's alleged performance failures were merely pretext for discrimination. According to the Third Circuit, "When considering whether remarks are probative of discrimination, [courts] consider the speaker's position in the organization, the content and purpose of the statement, and the 'temporal connection between the statement and the challenged employment action.'" *Hodczak v. Latrobe Specialty Steel Co.*, 451 Fed. Appx. 238, 241 (3d Cir. 2011) (quoting *Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 133 (3d Cir. 1997). Here, the alleged statement was made by the Plaintiff's direct supervisor who exercised direct decision-making authority within Abbott's Point of Care Division. In addition, the statement was made just three months prior to Plaintiff's termination from the company. Based on Mr. Hamil's position within the company and the close temporal connection between the statement and Plaintiff's termination, a reasonable jury could conclude that the statement in question was not simply a "[s]tray remark[] by [a] non-decisionmaker[] or by [a] decisionmaker[] unrelated to the decision process." *Parker*, 309 Fed. Appx. at 559.

Furthermore, the Plaintiff raises a genuine issue as to whether the alleged performance deficiencies cited by the Defendant were actually a product of his own mistakes or a result of institutional shortcomings within Abbott's Point of Care Division. While the Plaintiff admits that "20 percent" of the Distribution Partner and customer complaints lodged against him "were probably [his] fault," he avers that "80 percent" of the complaints cited by the Defendant "involved another variable." (Oral Arg. Tr. 7:16-20). According to the Plaintiff, such variables included Abbott's alleged failure to maintain an adequate supply of user manuals, Abbott's alleged failure to adequately define sales territories, and the company's alleged failure to inform its customers as to which sales representative was responsible for servicing their accounts. Furthermore, the Plaintiff contends that some of the alleged performance issues occurred when he was home after his heart ablation surgery. (Oral Arg. Tr. 32:22-25). A reasonable jury could conclude, based on these other

issues, that the complaints lodged against the Plaintiff were exaggerated by the Defendant to manufacture a reason for Plaintiff's termination. Accordingly, to the extent that Plaintiff bases his failure to accommodate claim on Abbott's failure to permit him to take two weeks off in February 2010 due to his disability, the entry of summary judgment will be denied.

## 2. Failure to Engage in the Interactive Process Under the ADA and NJLAD

Plaintiff further contends that Defendant violated the ADA and the NJLAD by failing to engage in the interactive process. In describing this process, the EEOC's interpretive guidelines state that, "[t]o determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the [employee] in need of accommodation. This process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3). The interpretive guidelines also provide that, "[o]nce a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." 29 C.F.R. pt. 1630, app. § 1630.9. As the Third Circuit has suggested, "[t]he interactive process, as its name implies, requires the employer to take some initiative." *Taylor*, 184 F.3d at 315. According to the Third Circuit, "an employer who has received proper notice cannot escape its duty to engage in the interactive process simply because the employee did not come forward with a reasonable accommodation that would prevail in litigation." *Id.* at 137.

The requirements for establishing a *prima facie* case of discrimination based on an employer's failure to engage in the interactive process are the same as those for proving a *prima*

*facie* case of discrimination based on an employer's failure to accommodate. *See Parker v. Verizon Pa., Inc.*, 309 Fed. Appx. 551, 560 (3d Cir. 2009) (citing *Taylor*, 184 F.3d at 319-320). Therefore, a disabled employee must demonstrate that: "(1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability: (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonable accommodated but for the employer's lack of good faith." *Id.* The interactive process under the NJLAD has been borrowed from the federal regulations under the ADA, and also consists of an informal interaction between the employer and the employee to identify potential reasonable accommodations geared to the individual employee's situation. *See Tynan*, 351 N.J. Super. at 400-01.

The Third Circuit has identified several ways in which employers can show good faith in the interactive process. Specifically, employers can "meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered employee's request, and offer and discuss available alternatives when the request is too burdensome." *Williams*, 380 F.3d at 772. The EEOC also obligates the employer to: (1) analyze the particular job involved and determine its purpose and essential functions; (2) consult with the disabled employee to understand his precise job-related limitations and how they could be overcome with a reasonable accommodation; (3) in consultation with the disabled employee, identify potential accommodations; and (4) considering the preference of the individual to be accommodated, select and implement the most appropriate accommodation. 29 C.F.R. pt. 1630, app. § 1630.9.

Here, Plaintiff cites to Mr. Hamil's February 2010 statement to support his contention that Abbott failed to engage in the interactive process. Plaintiff argues that Mr. Hamil's alleged

statement, made in response to Plaintiff's request for two weeks off to care for his son and address

his disability, shows Abbott's bad faith in the interactive process. For the reasons discussed above,

the Court finds that this comment does provide sufficient evidence for a reasonable jury to conclude

that Abbott failed to engage in the interactive process in good faith. Accordingly, to the extent that

Plaintiff's discrimination claims are based on Defendant's alleged failure to engage in the interactive

process, the Court finds that summary judgment is inappropriate.

## C. Plaintiff's ADA and NJLAD Retaliation Claims

Plaintiff also alleges that Defendant retaliated against him in violation of the ADA and

NJLAD. Specifically, Plaintiff's allegations of retaliation are based on his having been placed on the

informal coaching plan, the performance improvement plan, and terminated in retaliation for (1)

having requested an accommodation for his atrial fibrillation; and (2) his association with his autistic

son. (Pl. Dep. 92:12-17, 93:14-94:14).

Defendant contends that Plaintiff cannot establish a *prima facie* case of retaliation under

either the ADA or the NJLAD because he cannot "show a causal connection between his alleged

protected activity and any alleged retaliation." (Def.'s Mot. Summ. J. at 22). In the alternative,

Defendant argues that even if Plaintiff can establish a *prima facie* case of retaliation, Plaintiff fails to

produce any evidence that raises a genuine issue as to whether Abbott's proffered legitimate, non-

discriminatory reason for his termination was pretextual.

Section 12203(a) of the ADA provides, in relevant part, that "[n]o person shall discriminate

against any individual because such individual has opposed any act or practice made unlawful by

this chapter or because such individual made a charge, testified, assisted, or participated in any

manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). The

NJLAD similarly provides:

It shall be unlawful discrimination . . . For any person to take reprisals against any person because that person has opposed any practices or acts forbidden under this act or because that person has filed a complaint, testified or assisted in any proceeding under this act or to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this act. N.J.S.A. 10:5-12.

To establish a *prima facie* case of retaliation under the ADA and the NJLAD, a plaintiff must show: "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997). If the plaintiff establishes a *prima facie* case of retaliation, the burden of persuasion shifts to the employer to articulate a legitimate, non-retaliatory reason for its adverse employment action. *Id.* If the employer satisfies its burden, the plaintiff "must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action. *Id.* at 501.

Here, the Court finds that Plaintiff has succeeded in establishing a *prima facie* case of retaliation under the ADA and the NJLAD. The record indicates that Plaintiff engaged in protected employee activity when he requested a reasonable accommodation in February 2010 to address his disability. The record further indicates that Plaintiff was placed on the performance improvement plan just one week after and terminated just three months after making this request. Furthermore, the Court finds that a reasonable jury could conclude, based on the evidence proffered by the Plaintiff, including the statement made by Mr. Hamil, that a causal connection exists between Plaintiff's request for accommodation and his subsequent termination from Abbott. For the reasons outlined earlier in this Court's analysis, the Court finds that Plaintiff has met his burden of producing sufficient evidence to raise a genuine issue as to whether Abbott's proffered legitimate, non-

discriminatory reason for his termination was pretextual. Accordingly, the Court declines entering summary judgment in favor of Defendant on these claims.

## III.    CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment (ECF No. 32) is GRANTED in part and DENIED in part.

Date: December 4, 2013

_____
PETER G. SHERIDAN, U.S.D.J.